UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 20-755 JGB (KKx) | Date | April 23, 2020 |
| Title | *Wendy Gish, et al. v. Gavin Newsom, et al.* | | |

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order DENYING Plaintiffs' Emergency Request for Temporary Restraining Order (Dkt. No. 8) (IN CHAMBERS)**

Before the Court is an Emergency Request for Temporary Restraining Order filed by Plaintiffs Patrick Scales, Wendy Gish, James Dean Moffatt, and Brenda Wood. ("Request," Dkt. No. 8.) The Court held a hearing on the Request on April 22, 2020. After considering the papers filed in support of and in opposition to the Request and argument presented at the hearing, the Court DENIES the Request.

## I.    BACKGROUND

On April 13, 2020, Plaintiffs filed their complaint against Defendants Xavier Becerra and Gavin Newsom (collectively, "State Defendants"); Chad Bianco, Jeff Hewitt, Kevin Jeffries, George Johnson, Cameron Kaiser, V. Manuel Perez, Karen Spiegel, and Chuck Washington (collectively, "Riverside Defendants"); Erin Gustafson, John McMahon, Robert A. Lovingood, Janice Rutherford, Dawn Rowe, Curt Hagman, and Josie Gonzales (collectively, "San Bernardino Defendants"). ("Complaint," Dkt. No. 1.) The Complaint alleges eleven causes of action: (1) Violation of Free Exercise Clause of First Amendment to U.S. Constitution; (2) Violation of Establishment Clause of First Amendment to U.S. Constitution; (3) Violation of Free Speech Clause of First Amendment to U.S. Constitution; (4) Violation of First Amendment Freedom of Assembly Clause; (5) Violation of Due Process Clause of Fourteenth Amendment to U.S. Constitution; (6) Violation of Due Process Clause of Fourteenth Amendment to U.S. Constitution; (7) Violation of Equal Protection Clause of Fourteenth Amendment to U.S. Constitution; (8) Right to Liberty (Cal. Const. Art. 1, § 1); (9) Freedom of Speech (Cal. Const.

Art. 1, § 2); (10) Freedom of Assembly (Cal. Const. Art. 1, § 3); and (11) Free Exercise and Enjoyment of Religion (Cal. Const. Art. 1, § 4).

Plaintiffs filed the Request on April 13, 2020, the same day they filed the Complaint. (Request.) In support of the Request, Plaintiffs filed:

- Declaration of Mark Meuser ("Meuser Declaration," Dkt. No. 8-2);
- Declaration of Wendy Gish ("Gish Declaration," Dkt. No. 8-3);
- Declaration of James Moffatt ("Moffatt Declaration," Dkt. No. 8-4);
- Declaration of Patrick Scales ("Scales Declaration," Dkt. No. 8-5);
- Declaration of Brenda Wood ("Wood Declaration," Dkt. No. 8-6);

Defendants opposed the Request on April 17, 2020. ("State Opposition," Dkt. No. 13; "Riverside Opposition," Dkt. No. 15; "San Bernardino Opposition," Dkt. No. 18.) In support of the State Opposition, State Defendants filed the Declaration of Todd Grabarsky. (Grabarsky Declaration," Dkt. No. 13-1.) In support of the Riverside Opposition, Riverside Defendants filed:
- Request for Judicial Notice ("Riverside RJN," Dkt. No. 15-1);
- Jason Anderson ("Anderson Declaration," Dkt. No. 15-2);
- Declaration of Kelly A. Moran, ("Moran Declaration," Dkt. No. 15-3);
- Declaration of Dr. Cameron Kaiser ("Kaiser Declaration," Dkt. No. 15-4.)

In support of the San Bernardino Opposition, San Bernardino Defendants filed a request for judicial notice. ("San Bernardino RJN," Dkt. No. 18-1.) The Court held a telephonic hearing on April 22, 2020.

## II.   REQUESTS FOR JUDICIAL NOTICE

Riverside Defendants and San Bernardino Defendants separately submit unopposed requests for judicial notice. (See Riverside RJN; San Bernardino RJN.) A court may take judicial notice of an adjudicative fact not subject to "reasonable dispute," either because it is "generally known within the territorial jurisdiction of the trial court," or it is capable of accurate and ready determination by resort to sources whose "accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Under Federal Rule of Evidence 201, "[a] court must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Judicial notice is appropriate here. The documents at issue are publicly available and not subject to reasonable dispute. Moreover, Defendants request only that the Court take judicial notice of the contents of the documents, not of the truth of those contents. Accordingly, the Court GRANTS the Riverside RJN and the San Bernardino RJN.

## III.   FACTS

On December 31, 2019, China reported incidents of a pneumonia of unknown cause

to the World Health Organization. Since then, that infectious disease, which came to be known as coronavirus disease 2019 (COVID-19), has swept the globe, infecting millions and killing nearly two hundred thousand people.[1]

Defendant Newsom, the Governor of California, declared a State of Emergency in California on March 4, 2020. (Complaint ¶ 30; Grabarsky Declaration, Exhibit 1.) On March 19, 2020, the Defendant Newsom issued Executive Order N-33-20, which directed all California residents to heed the State's public health directives relating to COVID-19, including the March 19, 2020 Order of the State Public Health Officer ("State Order"). (Complaint ¶ 31; Grabarsky Declaration, Exhibit 3.) The State Order requires "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." (Grabarsky Declaration, Exhibit 3.) On March 22, 2020, the Public Health Officer designated a list of "Essential Critical Infrastructure Workers," including "[f]aith based services that are provided through streaming or other technology." (Grabarsky Declaration, Exhibit 4.)

Defendant Kaiser, Riverside County's Public Health Officer, issued a Declaration of Local Health Emergency in Riverside County on March 8, 2020. (Kaiser Declaration ¶ 10.) On April 6, 2020, Defendants Kaiser and Johnson issued an Amended Order of the Health Officer for the County of Riverside and of the County Executive Officer as Director of Emergency Services ("Riverside Order"). (Complaint ¶ 62; Kaiser Declaration ¶ 10, Exhibit I.) The Riverside Order prohibits "[a]ll public or private gatherings . . . including, but not limited to an auditorium, . . . church, . . . or any other indoor or outdoor space used for any non-essential purpose including, but not limited to . . . church . . . ." (Complaint ¶ 63; Kaiser Declaration, Exhibit I.) Consistent with the State Order, the Riverside Order exempts essential business, including "courts of law, medical providers . . . daycare and child care . . . [and] necessary shopping at fuel stations, stores or malls," provided that a "state and federal guidelines for infection control" are observed. (Complaint ¶ 64; Kaiser Declaration Exhibit I.)

The County of San Bernardino Board of Supervisors declared a Local Health Emergency in San Bernardino County on March 10, 2020. (San Bernardino RJN, Exhibits F and G.) On April 7, 2020, Defendant Gustafson, the San Bernardino Health Officer, signed the Order of the Health Officer of the County of San Bernardino for the Control of COVID-19 ("San Bernardino Order"). (Complaint ¶ 36; San Bernardino RJN, Exhibit I.) The San Bernardino Order "allow[s] faith based services that are provided through streaming or other technology, while individuals remain in their homes, but does not allow individuals to leave their home for driving parades or drive-up services, or for picking up non-essential items." (Complaint ¶ 37; San Bernardino RJN, Exhibit I.)

---

[1] World Health Organization, Coronavirus Disease 2019 Situation Report, April 23, 2020 https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4

## IV. LEGAL STANDARD

The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction. See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); see Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Ninth Circuit employs the "serious questions" test, which states "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). "A preliminary injunction is an 'extraordinary and drastic remedy.' It should never be awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citation omitted). When seeking a temporary restraining order through an *ex parte* application, a plaintiff must further show that he is without fault in creating the crisis necessitating the bypass of regular motion procedures. See Mission Power Eng'g Co. v. Cont'l Gas Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995). The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury, Simula, Inc. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999), that must be imminent in nature, Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

## V. DISCUSSION

Plaintiffs request that the Court enjoin enforcement of the State Order, Riverside Order, and San Bernardino Order (collectively, "Orders") to "Plaintiffs' engagement in religious services, practices, or activities at which the Center for Disease Control's social distancing guidelines are followed." (Request at 24.) To succeed, Plaintiffs must demonstrate that they are likely to succeed on their claims that the Orders violate their constitutional rights and demonstrate that the other factors weigh in favor of granting the temporary restraining order.

### A. Success on the Merits or Serious Questions

Plaintiffs assert that the Orders violate their constitutionally protected rights, including their right to the free exercise of religion. (Request at 9–21.) In response, Defendants argue that Plaintiffs will not succeed on their constitutional claims for two reasons: First, as acts of the executive in response to a national emergency, the Orders are subject to only minimal scrutiny,

which they easily survive.[2] (State Opposition at 7–14.)  Second, even absent consideration of greater leeway afforded to executive acts during a state of emergency, the Orders do not violate Plaintiffs' rights under traditional constitutional analysis.  (State Opposition at 14–19; Riverside Opposition at 16–34; San Bernardino Opposition at 11–17.)

1. **Exercise of Executive Powers During State of Emergency**

State Defendants argue that because the Orders are temporary executive actions taken in response to a national emergency, they are entitled to substantial judicial deference and not subject to traditional constitutional scrutiny.  (State Opposition at 7–14.)  The Court agrees:  Defendants have a right to protect California residents from the spread of COVID-19—even if those protections temporarily burden constitutional rights to a greater degree than normally permissible.

The Supreme Court held over a century ago that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."  Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 27 (1905).  The COVID-19 pandemic threatens the lives of all Californians: indeed, nearly 1,500 have already died.[3]  The virus has proven to be extremely contagious—it is airborne and can linger on surfaces for days.[4]  Because asymptomatic and pre-symptomatic carriers of the virus can infect others, a belief that one "has never had or contracted the coronavirus . . . been at any time exposed to the danger of contracting it . . . and has never been in close proximity to any locality where said coronavirus has or have existed" is largely meaningless.  (See Complaint ¶¶ 58, 79.)  Anyone could be an unknowing, undetectable vector for the virus at any time.  For these reasons, government and health officials have struggled to contain the virus.  Without a vaccine, measures limiting physical contact between citizens, such as the Orders, are widely recognized as the only way to effectively slow the spread of the virus.

Undoubtedly, the Orders—and the similar orders in effect around the country—restrict the rights and freedoms normally enjoyed by citizens.  The residents of California are confined to their homes, unable to gather with friends and family, unable to attend political rallies, unable to enjoy art and recreation, and largely unable to work or go to school.  The Orders also prevent Plaintiffs (and all other California residents) from gathering for in-person worship or laying hands upon each other.  Because Plaintiffs' religious beliefs compel them to do these things, the Orders

---

[2] Although only the State Defendants advance this argument, the Court will apply it to all three orders.

[3] *Tracking Coronavirus in California*, Los Angeles Times https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (last accessed April 23, 2020.)

[4] Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. England J. Med. 2020; 382:1564-1567 https://www.nejm.org/doi/full/10.1056/NEJMc2004973  (last accessed April 23, 2020.)

do burden Plaintiffs' unrestrained exercise of their religion. But the Constitution does not guarantee "an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." Jacobson, 197 U.S. at 26. Indeed, "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease." Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944).

Recognizing that the need to protect the public may trump individual rights during a crisis, the Supreme Court has held that states and municipalities have greater leeway to burden constitutionally protected rights during public emergencies:

> In every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

Jacobson, 197 U.S. at 29; see also United States v. Caltex, 344 U.S. 149 (1952) (acknowledging that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved"). When responding to the COVID-19 pandemic, therefore, Defendants "may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" In re Abbott, 2020 WL 1685929, at *7 (5th Cir. Apr. 7, 2020) (quoting Jacobson, 197 U.S. at 31). In other words, during an emergency, traditional constitutional scrutiny does not apply. Instead, any measures that limit or suspend constitutional rights (1) must have a "real or substantial relation" to the crisis and (2) must not represent "plain, palpable" invasions of clearly protected rights. Jacobson, 197 U.S. at 31.

The Orders easily meet that test. First, they have a substantial relation to the COVID-19 crisis: they require the physical distancing that is needed to slow the spread of the virus. Second, there is no "plain, palpable invasion" of Plaintiffs' free exercise of religion. While Plaintiffs are unable to gather together in-person, they are free to gather virtually or over the phone. They are also free to gather in-person with the members of their household. They remain free to practice their religion in whatever way they see fit so long as they remain within the confines of their own homes. Although physical contact with others is curtailed, a wide swath of religious expression remains untouched by the Orders. The Orders, therefore, do not represent a plain or palpable invasion of the general right to free exercise of religion. Accordingly, the Orders are likely a permissible exercise of executive authority during a national emergency.

### 2. Traditional Constitutional Analysis

Because the Orders survive the minimal scrutiny required where executive action taken in response to an emergency, the Court need not determine whether the Orders likewise survive traditional constitutional analysis. But they do: the Request must also be denied because the

Orders likely do not impermissibly infringe on Plaintiffs' constitutional rights even when applying the traditional constitutional scrutiny.

### a. Free Exercise of Religion

Plaintiffs argue that the Orders target religion and must therefore be subjected to a strict scrutiny analysis. (Request at 9–11.) Defendants respond that the Orders are neutral and generally applicable and therefore only rational basis review applies. (State Opposition 15–16; Riverside Opposition at 16–19; San Bernardino Opposition at 11–13.) "In assessing neutrality and general applicability, courts evaluate both 'the text of the challenged law as well as the effect . . . in its real operation." Parents for Privacy v. Barr, 949 F.3d 1210, 1234 (9th Cir. 2020).

The Orders are neutral on their faces: they "make no reference to any religious practice, conduct, belief, or motivation." Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1076 (9th Cir. 2015). While they do list faith-based gatherings as a type of in-person gathering that is prohibited, faith-based gatherings are referenced as an example—they are not the target of the Orders. (See e.g., Kaiser Declaration Exhibit I (prohibiting all gatherings including those for "church").) Facial neutrality does not require freedom from any mention of religion, instead "the minimum requirement of neutrality is that a law not *discriminate* on its face." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993) (emphasis added). Because the orders apply to both religious and secular gatherings, they do not discriminate, and are therefore facially neutral.

The Orders are also neutral in operation: they apply to both religious and secular conduct and do not "substantially underinclude nonreligiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." See Stormans, 794 F.3d at 1079. The Supreme Court has long recognized that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." Church of the Lukumi Babalu Aye, 508 U.S. at 534. Plaintiffs have presented no evidence that the Orders target religious conduct over secular conduct. And a review of the Orders demonstrates that both secular and religious conduct are prohibited equally. The majority of the prohibited conduct is secular: schools are closed, restaurants are shuttered, concerts and sporting events are canceled; citizens cannot visit public recreation spaces or gather with friends who live outside of their household; non-essential workers fortunate enough to still have jobs must work from home. Far from singling out religious conduct for additional restrictions, the State Order identifies workers preparing religious videoconferences as essential workers—an exception that facilitates religious conduct. Similar exceptions have not been made for sports, concerts, or non-essential work events. The Orders, therefore, are not restrictions against religion in disguise. They are generally applicable restrictions on gatherings of all kinds.

Plaintiffs argue that the Orders are underinclusive of secular activities that may also contribute to the spread of COVID-19 because they allow grocery stores, fast food restaurants, and marijuana dispensaries to remain open. (Request at 10.) But these are all essential services: without access to the food and medicines sold at these locations, more citizens would become ill or die. And despite social distancing the virus is spreading at these locations—grocery store

employees are falling ill and dying.[5]  If the state applies the same rules to in-person religious gatherings as it does to grocery stores, people will get sick and die from attending religious gatherings just as they are dying from working in grocery stores.

Moreover, because the risk of transmission increases with every out-of-home contact, it is necessary to suspend non-essential activities so that essential functions can be less dangerous. Many older and immunocompromised people must leave their homes to purchase food and medicine.  Grocery store employees, food preparers, delivery drivers, pharmacists, and other essential workers must go to work to ensure that California residents have what they need to survive.  These individuals risk contracting the virus when performing these essential tasks.  If those that they encounter engage in non-essential contacts, the risk of transmission increases. But if everyone limits their out-of-home contacts to only essential tasks, the risk decreases. When we all reduce our contacts to the minimum possible level, the rates of transmission go down.  In sum, Californians need to stay home whenever possible to protect those who cannot.

Finally, as Defendants argued at the hearing, constitutional analysis only requires that the Court compare the prohibited religious conduct with analogous secular conduct when assessing underinclusivity.  See Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1079 (9th Cir. 2015) (holding that a law is only fatally underinclusive if it prohibits religious conduct but not "comparable secular conduct").  An in-person religious gathering is not analogous to picking up groceries, food, or medicine, where people enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete.  Instead, it is more analogous to attending school or a concert—activities where people sit together in an enclosed space to share a communal experience.  Those activities are prohibited under the Orders.  Because the Orders treat in-person religious gatherings the same as they treat secular in-person communal activities, they are generally applicable.

Because the Orders are facially neutral and generally applicable, they are subject to rational basis review.  Stormans, Inc., 794 F.3d at 1075–76.  And they easily survive rational basis: the social distancing measures implemented by the Order are rationally related to slowing the spread of COVID-19—a state interest that is not only legitimate but compelling.  Accordingly, the Orders likely do not violate the Free Exercise Clause.

### b. Establishment of Religion

A government action violates the Establishment Clause if it lacks a "secular legislative purpose" or endorses religion.  Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971); see also Trunk v. City of San Diego, 629 F.3d 1099, 1106 (9th Cir. 2011) (noting that "the Supreme Court

---

[5] Dalvin Brown, *COVID-19 Claims Lives of 30 Grocery Store Workers, Thousands More May Have It, Union Says*, USA Today, https://www.usatoday.com/story/money/2020/04/14/coronavirus-claims-lives-30-grocery-store-workers-union-says/2987754001/ (last accessed April 23, 2020.)

(continued . . .)

essentially has collapsed the[] last two prongs [of the test articulated in Lemon] to ask whether the challenged governmental practice has the effect of endorsing religion.")  The Orders do neither.  First, they serve the important secular purpose of slowing the spread of COVID-19.  Second, they do not endorse any religion: the order bans gatherings for all religions along with secular gatherings.[6]  Accordingly, the Orders likely do not violate the Establishment Clause.

### c.  Other Alleged Constitutional Violations

Plaintiffs make several other claims for violations of their rights under the U.S. and California Constitutions.  (Request at 12–20.)  Each of these, however, is premised on Plaintiffs' argument that the Orders impermissibly restrict their religious exercise.  (See, e.g., Request at 13 (arguing that the Orders are an unconstitutional prior restraint on speech because religious worship is protected speech).)  Because the Court concludes that the Orders do not impermissibly restrict Plaintiffs' free exercise of religion, Plaintiffs' other claims likely fail as well.

### B.  Remaining TRO Factors

Defendants have shown that because the Orders are likely a proper exercise of executive authority in a state of emergency they are entitled to enhanced deference, even where they infringe on typically protected rights.  Moreover, even applying a traditional constitutional analysis, Plaintiffs' claims are unlikely to succeed.  Accordingly, Plaintiffs are not likely to succeed on the merits of their claims, and the Court need not consider the remaining factors.

## VI.  CONCLUSION

For the reasons above, the Court DENIES Plaintiffs' Request.

**IT IS SO ORDERED.**

---

[6] Plaintiffs argue that special accommodations were made by the Riverside Defendants and the San Bernardino Defendants for Christians celebrating Easter.  (Request at 2.)  However, they do not seek to enjoin enforcement of any Easter exception.  And they could not: Easter has passed.  Accordingly, the Court need not determine whether the Easter exceptions violated the Establishment Clause.